## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Federal Deposit Insurance Corporation, | : | Case No. 3:04 CV 7233 |
| Plaintiff, | : | |
| vs. | : | |
| Flagship Auto Center, Inc., *et al.*, | : | MEMORANDUM DECISION AND ORDER |
| Defendants. | : | |

The parties have consented to have the undersigned Magistrate enter judgment in this case seeking restitution and recovery based upon the default of a promissory note pursuant to 12 U. S. C. § 1819. Pending are: (1) Plaintiff's Motion for Partial Summary Judgment as to Defendants Flagship Auto and Pamela Siegenthanler, Executor of the Frederick Heifner estate (Flagship Defendants) (Docket No. 84) to which Flagship Auto and Pamela Siegenthaler filed an Opposition (Docket No. 106) and Plaintiff filed a Reply (Docket No. 112); (2) Plaintiff's Motion for Partial Summary Judgment as to Defendants WCOP and Winkle (Docket No. 132) to which Winkle and WCOP filed an Opposition (Docket No. 140) and Plaintiff filed a Reply (Docket No. 142); and (3) the Motion for Summary Judgment filed by Flagship Auto f.k.a. Flagship GM Center and Steve Myers Auto Sales (the Flagship Myers Defendants) (Docket No. 81) to which Plaintiff and Defendants Thomas J. Winkle (Winkle) and Winkle-Chevrolet-Oldsmobile-Pontiac (WCOP) filed

Oppositions (Docket Nos. 107, 125) and the Flagship Myers Defendants filed a Reply (Docket No. 110, 127).

For the reasons that follow, the Flagship Myers Defendants' Motion for Summary Judgment is granted in part (Docket No. 81) and Plaintiff's Motions for Partial Summary Judgment are granted in part (Docket No. 84, 132).

## PARTIES

This litigation involves multiple parties and a description of their roles follows. Plaintiff, a guarantor of the deposits of banks and savings associations, insured Oakwood Depository Company (Oakwood) and Liberty National Bank of Kenton (Liberty Bank), banking institutions organized under the general laws of the State of Ohio. Oakwood had its principal place of business in Oakwood, Ohio and Liberty Bank had its principal place of business in Kenton, Ohio (Docket No. 1, ¶s 1, 2, 3). Mark Steven Miller was Oakwood's Chief Executive Officer and Executive Vice President (Docket No. 1, ¶ 34). The Superintendent of Financial Institutions for the State of Ohio closed Oakwood on February 1, 2002 and appointed Plaintiff as receiver on February 1, 2002 (Docket No. 1, ¶ 3).

Defendant WCOP, an Ohio corporation, conducted business in Paulding, Ohio (Docket No. 1, ¶s 7, 8). Defendant Winkle owned and operated Defendant WCOP (Docket No. 1, ¶ 7). The dealership maintained a business account with Oakwood (Docket No. 1, ¶s 8, 15). Defendant Winkle was also the statutory agent for H & K Motor Sales (H & K), an Ohio corporation, that was owned by Defendant Winkle's father and brother (Docket No. 1, ¶ 10). H & K was dismissed as Defendant in this litigation on January 5, 2005 (Docket No. 34).

Defendant Steve Myers Auto Sales (SMAS) was an auto sales business operated in Kenton, Ohio (Docket No. 100, Exhibit 34, ¶ 12). Frederick Heifner was President and majority shareholder of SMAS

2

(Docket No. 100, Exhibit 34, ¶ 12). The SMAS Board was comprised of Jim Blair, Fred Heifner, Pamela

Siegenthaler, Frederick Heifner's daughter, Terry Keiser and Defendant Steve Myers (Myers) (Docket

No. 93, p. 33). Celeste Turcotte, Frederick Heifner's daughter, joined the Board in the Summer of 2001

(Docket No. 93, p. 38). Board member Defendant Myers, a resident of Kenton, Ohio, was employed to

manage the day-to-day operations (Docket No. 1, ¶ 9). SMAS maintained its business account at Liberty

Bank (Docket No. 1, ¶ 15). On December 19, 2001, Defendant SMAS Board changed the name of

SMAS to Flagship GM Center, Inc., and later on March 20, 2002, again changed the corporate name to

Flagship (Docket No. 1, ¶s 5 & 27).

## FACTUAL BACKGROUND

During 2001, Defendants Winkle and Myers engaged in purported "dealer trades" which allegedly

involved the purchase and sale of vehicles between Defendants WCOP and SMAS. Plaintiff alleges that

the sales did not occur but were part of a plan to cover-up a check kiting scheme (Docket No. 1, ¶s 14-

16). The alleged scheme was operated in the following manner. Checks were written on the Oakwood

account at the direction of Defendant Winkle and checks were written on the Liberty Bank account at the

direction of Defendant Myers (Docket No. 1, ¶ 15). Checks drawn on the Liberty Bank Account were

deposited into the WCOP account at Oakwood. The Liberty check would then be presented for payment

and cashed just prior to the Oakwood checks being deposited in the Liberty Bank Account to cover the

overdrafts at each bank with the process being repeated on a daily basis (Docket No. 1, ¶ 16).

It is estimated that during November 2001, Defendant Winkle wrote $1,963,818 in checks written

on the Oakwood Bank account and deposited them into the Liberty account. On November 23, 2001,

Defendant Winkle deposited $939,216 in checks written on the Liberty Bank account. Defendant Myers

wrote checks totaling $8,054,264 that were deposited by Defendant Winkle in the Oakwood account but

3

unpaid by Liberty Bank (Docket No. 1, ¶ 25). Oakwood presented the unpaid checks written by Defendant Winkle to Liberty Bank which paid $360,198 of the outstanding checks (Docket No. 1, ¶ 21). None of the checks written on the Oakwood account were returned unpaid upon presentment to Oakwood. Consequently, the proceeds from the paid checks were in the Liberty Bank account (Docket No. 1, ¶ 26). From January 2001 through November 2001, checks exceeding $140,000,000 were written on the Oakwood and Liberty Bank accounts (Docket No. 1, ¶s 17, 18).

On or about November 16, 2001, Ronald Zimmerly, Liberty Bank's Senior Loan Officer and Executive Vice President, discovered the alleged check kiting scheme involving the SMAS and WCOP accounts (Docket No. 91, p. 20-21). Mr. Zimmerly immediately notified Liberty Bank's President and Chief Executive Officer, William C. Carr, of the activity in the accounts (Docket No. 94, p. 25). Mr. Carr immediately directed that a hold be placed on all deposits to the SMAS account and that all checks written on the SMAS account and deposited in the WCOP account be returned (Docket No. 94, pp. 27, 33).

Defendant SMAS Board reorganized by removing Defendant Myers from his position on November 28, 2001, and establishing an account to be used on an interim basis (Docket No. 1, ¶s 19, 27, Docket No. 93, p. 32, Docket No. 95,p. 81, Docket No. 96, p. 87). Frederick Heifner opened a new account at Liberty Bank from which he authorized financial transfers and loan repayments to various other accounts (Docket No. 1, ¶ 31). Frederick Heifner paid $523,997.13 to satisfy outstanding personal or business loans with Liberty Bank from his personal account at the Hardin County Bank (Docket No. 1, ¶s 31, 32).

It is estimated that after the check kite scheme ceased, Defendant SMAS had an account balance at Liberty Bank of $7,046,623.87 (Boyd Aff. § 8). Defendant SMAS and Heifner used approximately $6,653,561.00 of this amount to pay off personal and business obligations (Boyd Aff. § 17). In the

4

meantime, Oakwood loaned Defendants Winkle and WCOP $500,000 (Docket No. 1, ¶ 29)[1].  Between

December 5, 2001 and January 8, 2002, Oakwood loaned Defendant Winkle $3,023,547.10 to cover account

overdrafts and operating expenses (Docket No. 1, ¶ 34).

In May 2003, a financial accounting and consulting firm was employed to perform a forensic

accounting (Docket No. 92, p. 16).  A preliminary examination revealed that Defendant WCOP deposited

$8,565,665, all drawn on Liberty Bank.  Approximately $8,054,264 was dishonored by Liberty Bank and

returned as uncollected funds or as payments stopped (Docket No. 92, pp. 37-38).

On August 6, 2003, Frederick Heifner died and Pamela Siegenthaler was appointed Executrix of his

estate (Docket No. 1, ¶ 33).  Plaintiff filed this case when Pamela Siegenthaler, on behalf of the Frederick

Heifner estate, denied its request for reimbursement of outstanding loans (Docket No. 1, ¶ 33).  Plaintiff

seeks partial summary judgment on the first claim of the Complaint for money had and received and unjust

enrichment against the estate of Frederick Heifner.  The Flagship Defendants also seek judgment as a matter

of law on the basis that (1) Plaintiff lacks standing to sue (2) that Plaintiff cannot be granted the relief

requested, (3) that they are not liable for Defendant Myer's acts, fraud or money had and received.

## SUMMARY JUDGMENT STANDARD

The summary judgment procedure is designed to dispose of cases wherein there are no genuine issues

of material fact and the movant is entitled to judgment as a matter of law.  See FED. R. CIV. P. 56.  Summary

judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, with the

affidavits if any, show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law.  FED. R. CIV. P. 56(c); *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995)

5

(*citing LaPointe v UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993)).

The moving party bears the initial burden of establishing an absence of evidence to support the non-moving party's case. *Celotex Corporation v. Catrett*, 106 S. Ct. 2548, 2552-2553 (1986). In the face of defendant's properly supported motion for summary judgment, the plaintiff cannot rest on his or her allegations to get to the jury without significant probative evidence tending to support the complaint. *Anderson v. Liberty Lobby, Incorporated*, 106 S. Ct. 2505, 2510 (1986) (*citing First National Bank of Arizona v. Cities Services Co.*, 88 S. Ct. 1575, 1593 (1968)). The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff. *Id.* at 2512.

To oppose a motion for summary judgment successfully, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1355 (1986). In determining if the facts are material, the court must look to the substantive law. The evidence of the non-movant is then taken as true and all justiciable inferences are drawn in his or her favor. *Anderson*, 106 S. Ct. at 2513 (*citing Addickes v. S.H. Kress & Co.*, 90 S. Ct. 1598, 1609-1610 (1970)). The Court must refrain from resolving conflicts in the evidence or making credibility determinations. *Id.* If, after deciding, the dispute about a material fact is genuine, summary judgment should be denied.

## DISCUSSION

### *Plaintiff's Motion for Summary Judgment as to the Defendants Flagship Auto and Heifner*
Docket No. 84

Plaintiff argues that equity will not allow the Flagship Defendants to continue to enjoy the use of money from the check kiting scheme to the detriment of the Oakwood depositors and creditors. Plaintiff

6

argues further that since the Flagship Defendants, Defendant Heifner and Defendant Winkle received more than $7 million of the check kite proceeds, they are obliged to return the money.

In the Motion for Partial Summary Judgment, Plaintiff presents a compelling argument that conscience and equity dictate that the windfall conferred on SMAS and Frederick Heifner as a result of the check kiting scheme should be returned to Oakwood, rightful owner of the monies. Plaintiff contends that SMAS and Frederick Heifner used the proceeds from the check kiting scheme to satisfy certain business and personal indebtedness. Consequently, they cannot now claim that the business did not benefit as a result of the scheme.

The Flagship Defendants claimed that this case is governed by the Uniform Commercial Code (UCC). In their Motion for Summary Judgment, they contend that they did not benefit from the check kiting scheme and that Defendant Myers acted outside to the scope of his employment. Therefore, they are not responsible for the illegal acts of their employee, Defendant Myers.

Defendant Winkle claimed that he unwittingly and unknowingly participated in Defendant Myers' scheme for which he received minimal benefit. He claims that he was not personally unjustly enriched by his participation in the check kiting scheme and therefore not liable for the return of the proceeds.

The Supreme Court has determined that where the General Assembly has said there is no right of action, courts are without authority to create one and thus defy the law of the state. Ohio common law recognizes an action for money had and received when a party to a contract has fully performed and another party has been unjustly enriched thereby. *National City Bank, Norwalk v. Stang,* 618 N.E.2d 241, 242-243 (1992) (*citing Hummel v. Hummel*, 133 Ohio St. 520, 11 O. O. 221, 14 N.E.2d 923 (1938)). The action is an equitable action, based not on a contract but on a moral obligation to make restitution where retention of benefits bestowed would result in inequity and injustice. *Id.* Thus, a party to a contract may defeat an

7

action on the contract but, nevertheless, be liable in equity. *Id.* There are occasions where an innocent party may be liable for restitution to a defrauded party. *Id.* (*citing Oakley Bldg. & Loan Co. v. Murphy*, 84 Ohio App. 539, 40 O.O. 26, 84 N.E.2d 749 (1948)).

However, Articles three and four of the UCC establish the standard of care applicable to a bank's handling of a negotiable instrument. *Metz v. Unizan Bank,* 416 F. Supp.2d 568, 581 (N. D. Ohio 2006). The Ohio codification of the UCC incorporates a statement of purpose which also shows a legislative intent to supplant the common law in most instances. *Id.* OHIO REV. CODE § 1301.02(B) states that the underlying purpose and policy of the UCC, as adopted by the Ohio legislature is "(1) [t]o simplify, clarify, and modernize the law governing commercial transactions; (2)[t]o permit the continued expansion of commercial practices through custom, usage, and agreement of the parties; [and] (3)[t]o make uniform the law among various jurisdictions." *Id.* This purpose cannot be served if parties can avoid the requirements of the UCC by pleading common law causes of action along with their UCC claims for the same alleged transgressions. *Id.* at 581-582 (citations omitted).

Plaintiff refers the Court to two cases that specifically address the merits of money had and received claims. In *Javitch v. First Mantauk Financial Corporation*, 279 F. Supp. 2d 931, 946-947 (N. D. Ohio 2003), the receiver was charged with the protection of property owned or caused to be owned by a brokerage firm. *Id.* The receiver instituted a proceeding against the defendants for, *inter alia*, negligence, breach of fiduciary duties, and violations of the securities laws. *Id.* The Court found that it was precluded from determining the applicability of money had and received since there were factual issues as to whether the defendants were innocent parties or had knowledge of the improper utilization of escrow funds. *Id.* The Court did not address the propriety of the money had and received claims.

Likewise, in *FDIC v. Bank One, Waukesha,* 881 F. 2d 390 (7th Cir. 1989), the court of appeals

8

affirmed the jury's finding that the bank did not receive a benefit from the funds wrongfully obtained but utilized by a third party. This case provides no guidance as to the applicability of the money had and received theory.

Plaintiff has failed to identify any material facts with respect to the Flagship Defendants, Heifner, WCOP and Winkle's claim that the money had and received is supplanted by the UCC. Accordingly, Plaintiff's Motion for Partial Summary Judgment is denied as to Plaintiff's first and third claims against the Flagship Defendants, Heifner, Winkle and WCOP. The Flagship Defendant's Motion for Summary Judgment is granted as to Plaintiff's first claim.

### *Plaintiff's Motion for Partial Summary Judgment as to Defendants WCOP and Winkle*
Docket No. 132

The Magistrate has already resolved the issue of whether Defendants WCOP and Winkle are liable for money had and received; consequently, the sole issue as against Defendants WCOP and Winkle is whether Winkle and Myers are liable for fraud against a financial institution. Plaintiff contends that evidence of a massive check kiting scheme is uncontroverted. By its nature, the check kite is a fraud against a financial institution. Defendant Winkle argues that Plaintiff cannot rely upon his conviction as it is inconsistent with the evidence which showed that he was victimized by Defendant Myers.

A fraud claim requires proof that the defendant knowingly and intentionally made misrepresentations or concealed material facts, with the intention that the plaintiff rely on the misrepresentations or concealments. *Preferred RX v. American Prescription Plan*, 46 F. 3d 535, 550 (6th Cir. 1995). Defendants Myers and Winkle were convicted of conspiracy to defraud the United States pursuant to 18 U.S.C. § 371

9

and aiding and abetting bank fraud under 18 U.S.C. §§ 2 and 1344[2]. The elements of a Section 371 conspiracy to defraud are: (1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, i.e., to defraud the United States. *United States v. Douglas*, 398 F.3d 407, 413 (6th Cir. 2005) (*citing United States v. Khalife*, 106 F. 3d 1300, 1303 (6th Cir. 1997) *cert. denied*, 118 S. Ct. 685 (1998) (*quoting United States v. Jackson*, 33 F. 3d 866, 872 (7th Cir. 1994) *cert. denied*, 115 S. Ct. 1316 (1995)). The elements of bank fraud under Section 1344 are: (1) defendant must have knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) defendant must have done so with the intent to defraud; and (3) the financial institution must have been insured by the FDIC. *United States v. Isaiah*, 434 F. 3d 513, 520 (6th Cir. 2006) (*citing United States v. Reaume*, 338 F.3d 577, 580 (6th Cir. 2003)).

Defendants Winkle and Myers had the specific intent to cause the banks to lose money pursuant to a fraudulent scheme. Their criminal convictions are evidence that Defendants had the intent required to defraud the bank. In the course of committing fraud, Defendants caused Oakwood and Liberty Bank to transfer funds under their possession and control. In making such transfers, Defendants Winkle and Myer concealed facts on which Oakwood and Liberty Bank relied. The Magistrate finds such conduct is sufficient to bring the fraudulent scheme within the ambit of civil fraud. The only remaining issue is the amount of damages that were caused by the fraud.

For these reasons, Plaintiff's Motion for Summary Judgment is granted in part and the sole issue of damages emanating from the fraudulent acts of Defendants Myers and Winkle is reserved for trial.

---

[2]

Plaintiff relies on *United States v. Stone*, 954 F. 2d 1187, 1190 (6th Cir. 1992). In that case the Court upheld a conviction for check kiting under the defraud provision of Section 1344. The Sixth Circuit Court of Appeals did not address whether check kiting is tantamount to a claim for fraud.

10

***Motion for Summary Judgment of the Flagship Defendants as against Plaintiff***
Docket No. 81

In the Complaint, Plaintiff seeks an order from this Court (1) granting restitution from Defendants Siegenthaler, the Flagship Defendants, Thomas Winkle and WCOP for any money had and received (first and third claims); (2) declaring that Defendants Winkle, WCOP, Myers and the Flagship Defendants are liable for damages emanating from the check kiting scheme (second claim); (3) ordering Defendants WCOP, H&K Motor Sales, Thomas Winkle and WCOP to make restitution on the outstanding notes executed and delivered to Oakwood (fourth, fifth and sixth claims), and (4) finding that Defendants Winkle, Myers, WCOP and Flagship are liable for their fraudulent conduct.

The Flagship Defendants seek judgment as a matter law on the basis that (1) under principles of respondeat superior, they are relieved of liability for Defendant Myer's acts; (2) they are not liable under a theory of fraud, (3) there is no liability under the money had and received theory, (4) the damages that Plaintiff seeks are not recoverable; and (5) Plaintiff lacks standing to sue.

Defendant Winkle contends that judgment has already been entered for the full amount of the cross-claim against Defendant Myers; consequently, there are no viable claims against him. Specifically, since the Flagship Defendants have obtained judgment for the full amount of the cross-claim and they failed to designate such liability as joint and several, he is not legally obligated to contribute to the payment of the final judgment[3].

The Flagship Defendants present seven arguments in support of their claim that judgment should be

---

[3]

Defendant Winkle's claim lacks merit. Pursuant to the Consent Agreement (Docket No. 121) granting Flagship judgment against Defendant Myers for $405,839.37 the parties specifically state that the judgment does not affect the cross-claim against Winkle.

11

entered against Defendants Myers and Winkle for the amount of $405,839.87[4] and the claims against the Flagship Defendants dismissed. First, Plaintiff lacks standing to sue. Second, this Court lacks subject matter jurisdiction over the claims against the Heifner estate. Third, Defendants Myers and Winkle are liable for damages totaling $405,839.87 since they admitted to the elements of the civil liability claim. Fourth, the Flagship Defendants are not liable since Defendant Myers' acted outside the scope of his employment. Fifth, no action lies or contract implied since the Flagship Defendants did not benefit from the monetary transactions of Defendant Myers. Sixth, there is no evidence that the Flagship Defendants engaged in fraud. Seven, Plaintiff's failure to mitigate damages relieves the Flagship Defendants of liability.

In response, Plaintiff argues that the Flagship Defendants admitted to the relevant facts that rendered them liable for money had and received. Accordingly, restitution for money had and received is a viable remedy. In the alternative, Plaintiff contends that since the Flagship Defendants benefitted from Defendant Myer's illegal acts, they cannot avoid liability by alleging that Defendant Myers acted outside the scope of his employment.

The February 2, 2006 consent agreement entered by and between Defendants Flagship and Myers renders judgment against Defendant Myers for the full amount of the cross-claim. Defendant Winkle therefore contends that he has no liability and the claims against him should be dismissed.

*Plaintiff's Standing to Sue*

The Flagship Defendants contend that Plaintiff lacks standing to sue for the recovery of the returned checks since they are not holders of the checks as defined under OHIO REV. CODE § 1303.31 (UCC § 3-301).

---

4

The Flagship Defendants served Requests for Admission pursuant to FED. R. CIV. P. 36 on Defendant Myers requesting that he admit that he converted at least $405,839.87 from Flagship Auto. This matter is deemed admitted since within thirty days after service, Defendant Myers failed to answer or object to the question (Docket No. 81, fn. 5).

12

Plaintiff contends that the recovery on the promissory notes does not depend on the sufficiency of returned checks; consequently, this issue of standing fails as a matter of law.

The FDIC is required to accept an appointment as receiver. 12 U. S. C. § 1821(c) (e) (Thomson/West 2006). In that capacity, the FDIC is subrogated to all rights and powers against an institution or branch to the extent of such assumption. 12 U. S. C. § 1821(g)(1) (Thomson/West 2006). The FDIC is therefore empowered to collect all obligations and money due the institution as well as preserve and conserve the assets of the institution. 12 U. S. C. §§ 1821(2)(B) (ii) & (iv) (Thomson/West 2006). Inherent in such power is the right to sue, be sued, complain and defend. 12 U. S. C. § 1819(a) (Thomson/West 2006).

Plaintiff filed this lawsuit to collect on outstanding promissory notes executed and delivered by Defendants WCOP, H & K Motor Sales and Defendants Winkle and WCOP. Plaintiff is not requesting recovery for outstanding checks returned to Liberty Bank. Whether Plaintiff is the holder of the returned checks is moot and does not alter the Plaintiff's standing to collect on all outstanding Oakwood obligations.

*Subject Matter Jurisdiction*

The Flagship Defendants renew their argument that this Court lacks jurisdiction over the subject matter of Plaintiff's claims against the Heifner estate. Plaintiff claims that this Court has already determined that it has subject matter jurisdiction over claims against the estate.

The Supreme Court has recognized a "probate exception" to otherwise proper federal jurisdiction. *Marshall v. Marshall*, 126 S. Ct. 1735, 1746 (2006). Federal courts have no jurisdiction to probate a will or administer an estate; however, federal courts of equity have jurisdiction to entertain suits against the estate in favor of creditors, heirs, legatees and others who have claims against the estate provided the federal court

13

does not interfere with the probate proceedings, assume general jurisdiction of the probate or assume control of the property subject to the probate court's custody. *Id.* (citations omitted); *Firestone v. Galbreath*, 976 F.2d 279, 282-283 (6th Cir. 1992) (*citing Markham v. Allen*, 66 S. Ct. 296, 337 (1946)).

This Court is not assuming general jurisdiction over the probate proceeding or the administration of the Heifner estate. The Court does, however, have subject matter jurisdiction over federal banking claims against the Heifner estate that arose in favor of potential creditors. The Flagship Defendants' claim that this Court lacks subject matter jurisdiction is without merit.

*Judgment Against Defendant Myers and Winkle*

The Flagship Defendants contend that because Defendants Myers and Winkle admitted to the elements of the civil conspiracy claim, the Flagship Defendants are entitled to judgment as a matter of law. Defendant Winkle argues that the terms of the February 2, 2006 Consent Judgment against Defendant Myers for the full amount of the Flagship cross-claim bars further action against him. Since Defendants Myers and Winkle (1) asserted their Fifth Amendment right to refuse to answer questions propounded during the depositions taken in this case and (2) make any admissions to their role in the conspiracy, the Flagship Defendants' argument is therefore construed to mean that the plea of guilty entered by Defendants Myers and Winkle in the criminal conspiracy claim constitutes an admission to the elements in a civil conspiracy claim.

A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. *Collyer v. Darling*, 98 F. 3d 211, 229 (6th Cir. 1996) *cert. denied*, 117 S. Ct. 2439 (1997). An express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. *Id.* Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. *Id.*

14

All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant. *Id. (citing Hooks v. Hooks,* 771 F. 2d 935, 943-944 (6th Cir. 1985)).

The indictment charged Defendants Myers and Winkle with conspiracy pursuant to 18 U. S. C. § 371 which prohibits two kinds of conspiracies: (1) to commit a specific offense against the United States and (2) conspiracies to defraud the United States. *United States v. Kraig,* 99 F. 3d 1361, 1366 (6th Cir. 1996). The Government was required to show that these Defendants conspired to commit a substantive offense against the United States. The proof required to show a criminal conspiracy under Section 371 is distinguishable from the proof required to demonstrate civil conspiracy liability. *Id.* Liability for the civil conspiracy lies in the damage resulting from the overt acts done pursuant to a common design. *Id.* Liability in the criminal case attaches to the agreement. *Id.*

Although Defendants Myers and Winkle were adjudicated guilty of criminal conspiracy, a substantive element of the civil case was not proven in the underlying criminal case. Specifically, there is no proof of damages in the underlying criminal case. Therefore, the Magistrate cannot find that civil liability is inherent in criminal culpability.

*Defendant Myers acted Outside the Scope of His Employment*

The Flagship Defendants contend that they are not vicariously liable for Defendant Myers' acts outside the scope of his employment. Plaintiff argues that as a matter of law, the doctrine of respondeat superior is not a viable defense as it has no force in an action in equity.

An employee acts within the scope of his or her employment only when he or she acts for the employer and acts to further the employee's business. *Booker v. GTE.net LLC,* 350 F. 3d 515, 519 (6th Cir.

15

2003). An employee who departs from his or her employment to engage in affairs of his or her own, relieves the employer from liabilities for his or her acts. *Id.* Under certain conditions, an employer will be vicariously liable for the torts of its employee. *Id. (citing Osborne v. Payne*, 31 S.W.3d 911 (Ky. 2000)). "The critical analysis is whether the employee or agent was acting within the scope of his employment at the time of his tortious act." *Id. (citing Osborne v. Payne*, 31 S. W. 3d at 915). Generally, intentional torts are committed outside the scope of the employment. *Id.* The scope of employment issue is governed by the law of the state in the conduct at issue concerned. *Coleman v. United States,* 91 F. 3d 820, 823 (6th Cir. 1996) (citations omitted).

In Ohio, the scope of employment is the result of a key factual inquiry as to who had the right to control the manner or means of performing the work. *Kuhn v. Youlten*, 118 Ohio App. 3d 168, 176, 692 N. E. 2d 226, 232 (1997) *(citing Bostic v. Connor*, 37 Ohio St. 3d 144, 524 N. E. 2d 881, paragraph one of the syllabus (1988)). An employer may be held liable under the doctrine of respondeat superior if the behavior giving rise to the intentional tort was calculated to further and/or promote the business. *Id.*

The evidence shows that Defendant Myers was an officer and agent for SMAS. From January 2001 through November 2001, Defendant Myers, in the capacity as officer and agent for SMAS, wrote checks drawn and deposited in SMAS account at Liberty Bank. SMAS Board Member Pamela Siegenthaler testified that Defendant Myers was authorized to make deposits at the bank and write checks; however, he was not authorized to take on overdrafts at the bank (Docket No. 93, p. 50). Board Member Jim Blair confirmed that Defendant Myers was not authorized to incur debt on lines of credit without board approval or take on overdrafts at the bank (Docket No. 96, pp. 73-74).

Defendant Myers acted outside the scope of his employment by incurring debt without board

16

approval or incurring huge overdraft fees for unpaid checks deposited in the Liberty Bank account. Defendant Myers' acts did not further the business but ultimately destroyed it. The Flagship Defendants are relieved from liability for Defendants Myers participation in the check kiting scheme.

*Respondeat Superior is Not An Affirmative Defense to Money Had and Received*

As previously discussed when assessing the merits of Plaintiff's Motion for Summary Judgment, under the express terms of OHIO REV. CODE § 1301.03, and the necessarily implied intention of the Ohio legislature in their enactment of the UCC, Plaintiff's claim for money had and received is supplanted by Ohio's codification of the UCC. Accordingly, the Court need not address whether respondeat superior constitutes an affirmative defense to the claim for money had and received.

*The Flagship Defendants are not Liable for Fraud*

Initially Plaintiff argued that the Flagship Defendants are liable for their fraudulent conduct[5]. Specifically, the Flagship Defendants represented to Oakwood that the SMAS checks written on the Liberty Bank account were valid checks with knowledge that the deposits in the Oakwood account would be credited to the Oakwood account and subject to immediate withdrawal. Such representations were made with the intention to induce Oakwood to rely on the validity of the checks. The Flagship Defendants responded that they made no representations that can be attributed to the kiting scheme and the resultant injury was not the result of deposits made by the Flagship checks. However, in the Memorandum of Law Plaintiff concedes

---

[5]

    The elements of fraud include a representation or, where there is a duty to disclose, concealment of a fact, which is material to the transaction at hand, made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, with the intent of misleading another into relying upon it, justifiable reliance upon the representation or concealment, and a resulting injury proximately caused by the reliance. *Pattison v. Employers Reinsurance Corp.* 900 F.2d 986, 989 (6th Cir. 1990) (*citing Copeland v. Delvaux*, 89 Ohio App.3d 1, 5, 623 N.E.2d 569, 571 fn. 4 (Ohio App. 6 Dist.1993) (*citing Burr v. Stark Cty. Bd. of Commissioners,* 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus (1986)).

17

that the facts fail to support a claim for fraud against the Flagship Defendants. The claim for fraud is therefore abandoned.

*The Damages Sought by Plaintiff are Not Recoverable*

The Flagship Defendants contend that Plaintiff is estopped from recovering damages in this case since it failed to pursue charge backs of the returned checks to WCOP or pursue bankruptcy remedies against WCOS.

The Magistrate is not persuaded that Plaintiff has an affirmative duty to mitigate damages. In fact, the defense of failure to mitigate damages goes against the weight of authority that the FDIC is not subject to the state law defense of mitigation of damages. *See FDIC v. Oldenburg,* 38 F. 3d 1119 (10th Cir. 1994) *cert. denied,* 116 S. Ct. 171 (1995); *FDIC v. Mijalis,* 15 F. 3d 1314, 1323 (5th Cir. 1994); *FDIC v. Bierman,* 2 F. 3d 1424, 1438-1441 (7th Cir. 1993); *FDIC v. Coble,* 720 F. Supp. 748, 750 (E.D. Mo. 1989); *Resolution Trust v. Scaletty,* 810 F. Supp. 1505, 1517 (D. Kan. 1992); *Resolution Trust v. Sands,* 863 F. Supp. 365, 369-370 (N. D. Tex. 1994). Since the Flagship Defendants have failed to present an argument or authority to the contrary, the Magistrate denies the Flagship Defendant's request that the damages sought are not recoverable since Plaintiff failed to mitigate damages.

## CONCLUSION

For these reasons, the Magistrate finds that (1) Plaintiff's Motion for Summary Judgment (Docket No. 84) is granted in part; (2) Plaintiff's Motion for Summary Judgment is granted in Part (Docket No. 132) and (3) the Flagship Defendants' Motion for Summary Judgment (Docket No. 81) is granted in part. There being no other viable legal claims against Flagship Auto or the Heifner Estate, they are dismissed as parties. There is a genuine issue of material fact with respect to the amount of damages resulting from the fraudulent

18

acts of Defendants Myers and Winkle.  This issue is reserved for trial.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
Vernelis K. Armstrong
United States Magistrate Judge

19