**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Federal Deposit Insurance Corporation,    :               Case No. 3:04 CV 7233

        Plaintiff,                    :

vs.                                     :

Flagship Auto Center, Inc., *et al*.,        :          **MEMORANDUM DECISION AND
ORDER**

        Defendants.               :

The parties have consented to have the undersigned Magistrate enter judgment in this case seeking restitution and recovery based upon the default of a promissory note pursuant to 12 U. S. C. § 1819.  Pending is Plaintiff's Motion for Summary Judgment for Damages (Docket No. 150), Response of Defendant Thomas J. Winkle (Winkle) and Winkle Chevrolet-Olds-Pontiac, Incorporated (WCOP) (collectively referred to as the Winkle Defendants) (Docket No. 157) and Plaintiff's Reply (Docket No. 159).  For the reasons that follow, Plaintiff's Motion for Summary Judgment is granted.

## FACTUAL BACKGROUND

A complete recitation of the parties, the facts, and their interrelationship is made in the Magistrate's Memorandum Decision and Order filed September 5, 2006 (Docket No. 145).  The following facts are relevant to the disposition of the issue before the Court.

Plaintiff is a corporation that insures the deposits of all banks and savings associations.  Plaintiff insured Oakwood Deposit Bank Company (Oakwood), a failed banking institution organized under the general laws of the State of Ohio[1] (Docket No. 1, ¶ 1); 12 U. S. C. § 1811 (a) (Thomson/West 2007).  Plaintiff is the receiver for Oakwood and therefore authorized to collect all debts owed to Oakwood.  At all times relevant to these proceedings, Oakwood's chief executive officer and executive vice president was Mark Steven Miller (Docket No. 1, ¶s 1, 2, 3 & 34).

Defendant Winkle, a resident of Paulding, Ohio, was an officer and agent of Defendant WCOP.  Defendant WCOP, an Ohio corporation, conducted business in Paulding Ohio (Docket No. 1, ¶s 7, 8).  Defendant WCOP had an account at Oakwood which was closed on February 1, 2002 (Docket No. 1, ¶s 17 & 22).  Co-Defendant Steven L. Myers (Myers) was an officer and agent of Steve Myers' Auto Sales (SMAS) which he operated in Kenton, Ohio[2] (Docket No. 1, ¶s 5 & 9).  SMAS had an account at Liberty National Bank (Docket No. 1, ¶ 17).

During 2001, Defendants Winkle and Myers engaged in a scheme which involved sales of vehicles between the WCOP and SMAS dealerships (Docket No. 1, ¶s 14-16).  Payments were made on phantom sales through the use of checks written on Defendant WCOP's account under the direction of

---

[1]

The FDIC is required to accept an appointment as receiver. *F.D.I.C. v. Flagship Auto Center, Inc*. 2006 WL 2711788, *7 (N.D.Ohio,2006) (*citing* 12 U.S.C. § 1821(c)(e) (Thomson/West 2006)).  In that capacity, the FDIC is subrogated to all rights and powers against an institution or branch to the extent of such assumption. *Id.* (*citing* 12 U.S.C. § 1821(g)(1) (Thomson/West 2006)).  The FDIC is therefore empowered to collect all obligations and money due the institution as well as preserve and conserve the assets of the institution. *Id.* (*citing* 12 U.S.C. §§ 1821(2)(B)(ii) & (iv) (Thomson/West 2006)).  Inherent in such power is the right to sue, be sued, complain and defend. *Id.* (*citing* 12 U.S.C. § 1819(a) (Thomson/West 2006)).  In this case, Plaintiff is empowered to collect all obligations owed to Oakwood.

[2]

Plaintiff was awarded judgment in its favor against Defendant Myers under the complaint for the principal amount of $8,054,264.04 plus interest prescribed by federal law, until paid in full (Docket No. 116).  Defendant Myers also consented to pay the sum of $405,839.37, plus interest prescribed by federal law, to Defendant Flagship Auto Center (Docket No. 121).

Defendant Winkle and checks written on Defendant SMAS' account at the direction of Defendant Myers (Docket No. 1, ¶s 15 & 17).  Checks drawn on the Liberty account were deposited into the account at Oakwood.  Before the check was presented for payment and cashed, checks were deposited at the account on which the check was drawn (Docket No. 1, ¶ 16).  Mark Steven Miller covered any overdrafts by changing the bank's general ledger account to reflect a transfer of funds into the WCOP account at Oakwood (Docket No. 150, Exhibit 1, ¶s 17 & 18).

The National Bank Examiner, Christopher Boyd, discovered that until November 19, 2001, several checks drawn on both the WCOP and SMAS accounts were paid upon presentment by Oakwood to Liberty (Docket No. 150, Exhibit 1, ¶ 10).  On November 20, 2001, Liberty returned checks drawn on the SMAS account as drawn on uncollected funds (Docket No. 150, Exhibit 1, ¶ 11).  When Liberty notified Oakwood on November 20, 2001 of the returned items, Liberty did not charge them to WCOP's account or seek payment from WCOP for funds advanced (Docket No. 150, Exhibit 1, ¶s 11 & 12).  Instead, Liberty re-presented the checks for payment through the Federal Reserve System (FRS) from the SMAS account (Docket No. 150, Exhibit 1, ¶s 12 & 12a).  The FRS returned the checks unpaid and charged to the Oakwood account at FRS the sum of  $1,920,275.65 (Docket No. 150, Exhibit 1, ¶ 12a).

On November 19, 2001, Defendant Winkle made a deposit into the WCOP account and included $1,801, 882.97 in checks drawn on the SMAS account (Docket No. 150, Exhibit 1, ¶ 12b).  The SMAS checks were presented to Liberty for payment on November 20, 2001.  Liberty paid $360,198.78 and returned unpaid checks totaling $1,441,684.19 on November 21, 2001.  The unpaid checks were presented to the FRS for payment from the SMAS account on November 26, 2001, and were again returned unpaid by Liberty on November 28, 2001 (Docket No. 150, Exhibit 1, ¶ 12b).

On November 20, 2001, Defendant Winkle made another deposit into the WCOP account

including $1,950,471.30 in checks drawn on the SMAS account.  The SMAS checks were presented to Liberty for payment and on November 23, 2001, Liberty returned unpaid checks totaling $1,926,719.42. The unpaid SMAS checks deposited on November 20, 2001, were re-presented to Liberty for payment through the FRS on November 27, 2001.  Liberty paid $161,202.51 and returned unpaid checks totaling "$1,789,268.79".  Oakwood's account at the FRS was charged with unpaid check amounts totaling "$1,789,286.79" (Docket No. 150, Exhibit 1, ¶ 12c).

Defendant Winkle made another deposit into the WCOP account and included $1,963,818.76 in checks written on the SMAS account.  These checks were presented to Liberty for payment and all were returned unpaid.  Oakwood's account at the FRS was charged $1,963,818.76 on or about November 28, 2001(Docket No. 10, Exhibit 1, ¶ 12d).

Defendant Winkle made a third deposit into the WCOP account on November 23, 2001, which included $939,216.65 in checks written on the SMAS account.  The SMAS checks were presented to Liberty for payment and all of them were returned unpaid.  Oakwood's account at the Federal Reserve was charged $939,216.65 on or about November 28, 2001 (Docket No. 150, Exhibit 1, ¶ 12e).

When itemizing the losses, Christopher Boyd determined that the aggregate amount of checks written by Defendant Myers and deposited by Defendant Winkle into the WCOP account from November 16 through November 23, 2001 and then returned unpaid was $8,054,264.04.  Oakwood sustained this loss (Docket No. 150, Exhibit 1, ¶ 13).

Although Liberty stopped paying on the checks written on the SMAS account that were deposited in the WCOP account, Oakwood continued to pay the checks written by Defendant Winkle that were deposited into the SMAS account at Liberty.  To avoid detection of an overdrawn account, Mark Steven Miller changed Liberty's general ledger account to reflect a balance in the WCOP account (Docket No.

4

150, Exhibit 1, ¶s 17 & 18).  From December 5, 2001, through January 8, 2002, WCOP's accounts were credited with $3,708,692.40[3] (Docket No. 150, Exhibit 1, ¶s 18a-18f).  Oakwood sustained a total loss of $11,762,956.52 (Docket No. 150, Exhibit 1, ¶ 21).

The Magistrate determined that Defendant Winkle's conduct constituted a fraudulent scheme and that he was liable for damages emanating from his conduct in such scheme.  The issue of damages was reserved for trial.  Plaintiff seeks judgment against the Winkle Defendants for $11,762,956.52 as a matter of law.

## SUMMARY JUDGMENT STANDARD

The summary judgment procedure is designed to dispose of cases wherein there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See FED. R. CIV. P. 56. Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, with the affidavits if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Copeland v. Machulis,* 57 F.3d 476, 478 (6th Cir.1995) ( *citing LaPointe v. UAW, Local 600,* 8 F.3d 376, 378 (6th Cir.1993)).

The moving party bears the initial burden of establishing an absence of evidence to support the non-moving party's case. *Celotex Corporation v. Catrett,* 106 S. Ct. 2548, 2552-2553 (1986).  In the face of defendant's properly supported motion for summary judgment, the plaintiff cannot rest on his or her allegations to get to the jury without significant probative evidence tending to support the complaint. *Anderson v. Liberty Lobby, Incorporated,* 106 S. Ct. 2505, 2510 (1986) (*citing First National Bank of Arizona v. Cities Services Company,* 88 S. Ct. 1575, 1593 (1968)).  The mere existence of a scintilla of

---

[3]

Miller credited the WCOP account as follows:  December 5, 2001,$273,547.50; December 6, 2002, $750,000; December 24, 2001, $685,144.99; December 27, 2001, $925,000; January 3, 2002, $925,000; January 8, 2002, $150,000 (Docket No. 150, Exhibit 1, ¶s 18a-18-f).

evidence to support plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff.  *Id.* at 2512.

To oppose a motion for summary judgment successfully, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electrical Industry Company v. Zenith Radio Corporation,* 106 S. Ct. 1348, 1355 (1986).  In determining if the facts are material, the court must look to the substantive law.  The evidence of the non-movant is then taken as true and all justiciable inferences are drawn in his or her favor.  *Anderson,* 106 S.Ct. at 2513 (*citing Addickes v. S.H. Kress & Company*, 90 S. Ct. 1598, 1609-1610 (1970)).  The Court must refrain from resolving conflicts in the evidence or making credibility determinations.  *Id.*  If, after deciding, the dispute about a material fact is genuine, summary judgment should be denied.

## <u>DISCUSSION</u>

The Magistrate has already determined that the fraudulent representations made by Defendant Winkle caused Oakwood's demise and resulting damages.  The sole issue before the Court is, therefore, the amount of damages, if any, that resulted from Defendant Winkle's fraudulent behavior.  Plaintiff seeks an order for payment of damages in the amount of $11,077,586.16 against the Winkle Defendants. The Winkle Defendants vehemently oppose Plaintiff's request for judgment against them and seek an order denying an award of damages against them.

The Winkle Defendants argue that Plaintiff is estopped from seeking damages from them since the judgment will be satisfied pursuant to the consent agreement entered for $8,054,264 by Defendant Myers.  In the alternative, the Winkle Defendants claim that they are entitled to set-offs from the total amount of judgment since Plaintiff is, in part, responsible for the success of the check kiting scheme. The Winkle Defendants also claim that they are not liable for fraudulent acts since (1) Defendant Winkle

6

was duped and thus, victimized by Defendant Myers with the assistance of Mark Steven Miller; (2) the Winkle Defendants did not receive any benefit from the check kiting scheme employed by Defendant Myers and Mark Steven Miller, (3) Defendant Winkle did not intend to induce Oakwood to act in any manner, (4) Oakwood's reliance on Defendant Winkle's representation was expressly directed by Mark Steven Miller and (5) the check kiting scheme was undertaken at the express direction of Defendant Meyer and Steven Miller.

A person who has been injured by fraud of another or others, by either a party or parties to a transaction or a third party or third parties committing fraudulent acts involving or bringing about the negotiation of a transaction, such transaction usually but not necessarily involving business or commercial dealings, may maintain an action at law in tort to recover damages for the injury received from the fraud and deceit perpetrated by such other or others. *Cincinnati Gas & Electric Company v. General Electric Company*, 656 F. Supp. 49, 72 (S. D. Ohio 1986). The foundation of the action is not contract but tort. *Id.* Under Ohio law, the remedies available for fraud include both actual, consequential and punitive damages. OHIO REV. CODE § 2307.60 (Thomson/West 2007). The amount of recovery possible is the same as the amount of recovery possible for the fraud claim. OHIO REV. CODE § 2307.60 (Thomson/West 2007).

Settlement agreements are contracts and their interpretation is governed by contract law. *Hageman v. Signal L. P. Gas, Incorporated*, 486 F.2d 479, 487 (6th Cir. 1973) (*citing Diamond v. Davis Bakery, Incorporated*, 8 Ohio St.2d 38, 222 N.E.2d 430 (1966); *Adams Express Company v. Beckwith*, 100 Ohio St. 348, 126 N.E. 200 (1919)). A settlement agreement that arises out of litigation in which joint-tortfeasors are involved must necessarily have an effect on a joint tortfeasor not a party to the agreement. *Id.* In fact, a joint tortfeasor may raise as a defense plaintiff's settlement with another joint

tortfeasor for full or partial satisfaction of the claim.  *Id.* (*citing Connelly v. United States Steel Company*, 161 Ohio St. 448, 119 N.E.2d 843 (1954), *Davis v. Buckeye Light & Power Company*, 145 Ohio St. 172, 61 N.E.2d 90 (1945)).  While a defendant cannot benefit from a settlement agreement between the plaintiff and a co-defendant, neither can the settlement agreement work to his nor her detriment.  *Id.*  A person injured by actions of more than one party may enforce his or her claim entirely against one of the parties or severally against all of them.  *Id.* (*citing Larson v. Cleveland Railroad*, 142 Ohio St. 20, 50 N.E.2d 163 (1943)).

A settlement of a claim with one tortfeasor is, to the extent of the settlement, "a satisfaction *pro tanto* to the party wronged and to that extent works a discharge to all joint wrongdoers."  *Id.* (*citing Adams Express Company v. Beckwith*, 100 Ohio St. 348, 126 N.E. 300 (1919) (paragraph 4 of the syllabus)).  A joint wrongdoer is defined as one who actively participates, cooperates in, requests, aids, encourages, ratifies, or adopts a wrongdoer's actions in pursuance of a common plan or design to commit a tortious act."  *Aetna Casualty and Surety Company v. Leahey Construction Company*, 219 F.3d 519, 544 (6th Cir. 2000) (*citing Clevecon, Inc. v. Northeast Ohio Regional Sewer District,* 90 Ohio App.3d 215, 628 N.E.2d 143, 148 (1993)).  Where damages are caused by the joint acts of two or more persons, each defendant may be held liable for damages incurred jointly or severally.  *Id.* (*citing Shoemaker v. Crawford*, 78 Ohio App.3d 53, 603 N.E.2d 1114, 1122 (1991)).

Here the Magistrate finds that the Winkle Defendants' alternative arguments are related to the propriety of the Court's finding that he participated in the fraudulent acts during which Oakwood sustained damages.  The Court has already entered an order addressing the Winkle Defendants' liability.  In fact, under the law-of-the-case doctrine, findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation.  *Rouse v. DaimlerChrysler Corporation*, 300

8

F.3d 711, 715 (6th Cir. 2002) (*citing United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir.1994)).  The Magistrate finds it unnecessary to again address the issue of whether the Winkle Defendants are liable for damages because of their fraudulent acts.

There was no expressed reservation of rights nor an expression that full satisfaction had been received in the settlement agreement with Defendant Myers; consequently, the settlement agreement does not operate to bar Plaintiff from receiving full satisfaction for the outstanding obligations owed to Oakwood from joint tortfeasor, the Winkle Defendants.  Both Myers and the Winkle Defendants aided in the execution of the fraudulent scheme and each is liable to the full extent of any and all damages caused by the fraud.  The Winkle Defendants have failed to present evidence that creates a genuine issue of material fact regarding Plaintiff's entitlement to the same payment for the damages Oakwood incurred as a result of the same tortious acts.

Plaintiff is therefore awarded judgment against the Winkle Defendants for $8,054,264.04 plus applicable federal interest from the date judgment is entered by the Court.  To the extent that Defendant Myers has made or makes payments on the Consent Decree entered on January 19, 2006, credits in a similar amount will be deducted from the judgment against the Winkle Defendants.

## CONCLUSION

For these reasons, the Plaintiff's Motion for Summary Judgment is granted.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
Vernelis K. Armstrong
United States Magistrate Judge

Date:   September 6, 2007

9